[Cite as *State v. Gomez*, 2019-Ohio-576.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-17-1130

       Appellee                                    Trial Court No. CR0201601548

v.

Antwine Gomez                                    **DECISION AND JUDGMENT**

       Appellant                                    Decided:  February 15, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**MAYLE, P.J.**

## I.  Introduction

{¶ 1} Appellant, Antwine Gomez, appeals the judgment of the Lucas County

Court of Common Pleas, sentencing him to a prison term of 40 years to life following a

jury trial at which he was found guilty of one count of importuning and four counts of

rape.  Because we find that the trial court properly denied appellant's motion to suppress and motion for a new trial, and in light of our determination that appellant's conviction is supported by sufficient evidence and is not against the manifest weight of the evidence, we affirm.

## A.  Facts and Procedural Background

{¶ 2} On March 23, 2016, an indictment was filed with the trial court, charging appellant with one count of importuning in violation of R.C. 2907.07(D)(1), (F)(1), and (F)(3), a felony of the fifth degree, one count of rape in violation of R.C. 2907.02(A)(2) and (B), a felony of the first degree, and three counts of rape in violation of R.C. 2907.02(A)(1)(b) and (B), felonies of the first degree.  The indictment alleged that appellant engaged in sexual activity with another, who was later identified as M.D., over a time period that spanned several years.  The three counts of rape in violation of R.C. 2907.02(A)(1)(b) and (B) pertained to sexual activity that occurred prior to M.D.'s thirteenth birthday.  The remaining rape count and importuning count dealt with sexual activity that occurred after M.D.'s thirteenth birthday.  Appellant was an adult during the relevant time frame set forth in the indictment.

{¶ 3} On May 9, 2016, appellant appeared before the trial court and entered a plea of not guilty to the aforementioned charges.  The matter was set for trial, and pretrial discovery ensued.  On October 26, 2016, appellant filed a motion to suppress, in which he argued that certain statements he made to police during a discussion at the Sylvania Township Police Department were inadmissible because they were given while appellant

2.

was in custody before appellant was informed of his *Miranda* rights. Further, appellant asserted that certain statements he made after he was informed of his *Miranda* rights should be suppressed because the statements were made in response to questions posed to him after he invoked his right to an attorney.

{¶ 4} In response to appellant's motion to suppress, the state filed its memorandum in opposition, arguing that appellant was not in custody when he made his pre-*Miranda* statements. In support of its assertion that appellant was not in custody, the state noted that appellant was asked, not directed, to come to the police station to answer some questions, he drove his own vehicle to the station, he was advised prior to any questions that he was not under arrest and was there of his own free will, and he was not handcuffed or placed under any restraint.

{¶ 5} At some point after he was informed of his *Miranda* rights, appellant stated that "I probably need a lawyer" and "I probably won't be going to work today, and I probably need a lawyer." According to the state, police interrogation ceased at this point. Appellant was informed that he was not under arrest and that he could go to work. Appellant then stated, "Well with the information you have, I will be soon." The state, in its memorandum, argued that this statement should not be suppressed because it was given without any prompting by the police. Moreover, the state argued that appellant failed to affirmatively invoke his right to counsel when he stated that he *probably* needed a lawyer. Given appellant's ambiguous reference to counsel, the state asserted that questioning could have continued without violating appellant's constitutional rights.

3.

**{¶ 6}** A hearing on appellant's motion to suppress was held on November 14, 2016. Detective Robert Colwell of the Sylvania Township Police Department was the only witness to testify at the hearing.

**{¶ 7}** Colwell testified that appellant previously resided with M.D. as a result of a dating relationship he had with M.D.'s mother, T.P. Due to prior allegations of sexual assault against appellant pertaining to M.D., appellant was ordered to have no further contact with M.D. In February 2016, Colwell was alerted by prosecutors that appellant had reinitiated contact with M.D.

**{¶ 8}** Colwell proceeded to meet with T.P. at Northview High School on March 15, 2016, in order to verify that appellant had indeed reinitiated contact with M.D. In order to do so, Colwell had T.P. send appellant a text message from M.D.'s mobile phone asking appellant to bring her lunch at the school. When appellant arrived at the school, Colwell approached him and asked him what he was doing at the school. Appellant acknowledged that he was at the school in order to bring lunch to M.D. Colwell observed food sitting on the front seat of appellant's vehicle.

**{¶ 9}** Thereafter, Colwell asked appellant if he would be willing to drive his vehicle to the police station for further conversation regarding M.D. According to Colwell, appellant was advised at this time that he was not under arrest and that Colwell only wished to talk to him. Appellant agreed to discuss the matter further with Colwell, and proceeded to drive himself to the police station.

4.

{¶ 10} Upon arrival at the station, appellant was taken into an interview room, where Colwell reminded appellant that he was not under arrest and was free to leave at any time. Appellant was not placed in handcuffs or restrained in any manner. Colwell proceeded to record the ensuing 14-minute interview, which was played back for the court at the suppression hearing.

{¶ 11} Initially, Colwell questioned appellant as to whether any sexually explicit communications were exchanged between appellant and M.D. Appellant replied in the negative. About eight minutes into the interview, Colwell informed appellant of his *Miranda* rights, and continued to question appellant about text message communications he sent to M.D. Colwell then informed appellant that he was in possession of over 200 pages of text messages describing prior incidences of sexual contact between appellant and M.D. At this point, appellant stated to Colwell that he "probably [needed] a lawyer." Colwell then asked appellant where he worked. After appellant replied, Colwell informed appellant that he was free to end the interview if he wished. Appellant indicated that he wished to end the interview. After providing Colwell with his contact information, appellant exited the interview room and the conversation ended.

{¶ 12} During cross-examination, Colwell acknowledged that appellant was a suspect at the time of the interview at the police station. Colwell also indicated that the door on the interview room automatically locked once it was shut, but noted the fact that appellant was informed during the interview that he was free to leave at any time.

5.

{¶ 13} At the conclusion of the hearing, the trial court took the matter under advisement and ordered the parties to brief the matter further. Upon consideration of the parties' arguments and the testimony from the hearing, the trial court issued its decision on appellant's motion to suppress on February 27, 2017. In its judgment entry, the trial court found that the evidence obtained from Colwell's interview of appellant was not subject to suppression because appellant was not in custody during the interview. In finding that a custodial interrogation had not taken place, the trial court took particular note of the fact that appellant was permitted to leave the interview room without question or incident as soon as he expressed a desire to terminate the conversation. Although the interview room door was locked during the interview, the trial court noted that appellant was unaware of that fact, and further found that nothing in the record would have led appellant to objectively believe that he would not be permitted to leave the interview upon request. Consequently, the trial court denied appellant's motion to suppress.

{¶ 14} On April 10, 2017, the matter proceeded to a five-day jury trial, during which the state presented several witnesses. Appellant called one witness and took the stand in his own defense. Over the course of the trial, the following facts were established.

{¶ 15} On July 25, 2014, T.P. first informed Detective Colwell that appellant had sexually abused M.D. Following these allegations, Colwell interviewed appellant, M.D., and T.P. Appellant denied the allegations. Thereafter, Colwell obtained a DNA sample from appellant, and conducted a search of appellant's residence. During the search, M.D.

6.

walked through the residence with Colwell, showing him the areas in which the sexual assaults took place. Various items were seized from these areas, and subsequently examined by the Bureau of Criminal Investigations (BCI) for any evidence of semen. No semen was found on the seized items.

{¶ 16} Colwell referred M.D. to a sexual assault nurse examiner (SANE) nurse, Brittni Mercer. During Mercer's interview with M.D., M.D. indicated that appellant put his penis in her vagina, and stated that the sexual abuse had been going on for over two years, with the most recent occurrence taking place three days prior. Concerning the most recent rape, M.D. stated that appellant "pulled out and ejaculated and then did it again, and then when he was done told her to go shower."

{¶ 17} Mercer proceeded to conduct a physical examination of M.D., which revealed no acute injuries or abnormal findings. Mercer explained that normal physical examinations are not unusual given the rapid healing that occurs, particularly when the victim has experienced sexual abuse over a prolonged period of time.

{¶ 18} Consistent with her statements to Mercer, M.D. reported sexual abuse during an examination performed by the state's expert, Dr. Randall Schlievert, who testified that M.D. told him that the first rape occurred when she was ten years old. According to Schlievert, M.D. indicated that appellant forced her to "go into a room, take her clothes off, his clothes off, and then she pretty much said is the long and short of it is he penetrated me." Schlievert went on to recount M.D.'s reports of further touching and penetrations, stating:

7.

She described one time where she said she didn't want to do it, and he went to the kitchen and got a knife and held it to her to force her to do the sexual acts.

And then there were times that she said he pulled her to the floor and would wrap his legs around her tightly and so tight to the point where she couldn't breathe and she felt like she was going to pass out. She didn't, but she felt like she was. And it sounds like these things occurred from the course of 10 to 13 years of age, and she was scared to tell.

{¶ 19} Following his examination of M.D., Schlievert authored a report that was admitted at trial. In the report, Schlievert diagnosed M.D. as sexually abused, notwithstanding the fact that M.D.'s examination did not reveal physical signs of sexual abuse. Schlievert explained at trial that a normal physical examination was not inconsistent with sexual abuse, because healing occurs rapidly and not all sexual acts generate the same injury. With respect to abuse that happened at least one month prior to the examination, Schlievert testified that a normal examination occurs "about 95 to 98 percent of the time."

{¶ 20} In conjunction with her physical examination of M.D., Mercer performed a rape kit. The rape kit was taken to BCI, where it was examined for the presence of appellant's DNA. Appellant's DNA was not present on the rape kit. Colwell explained that, in his years of experience investigating "well over 100" crimes of sexual assault, a lack of DNA evidence is not uncommon, especially where, as here, there is a delayed

8.

disclosure of sexual abuse and a lapse of time during which any DNA would be removed from the victim's person. According to Colwell, the most recent incident involving appellant occurred three days prior to the first report of sexual abuse.

{¶ 21} As Colwell was conducting his initial investigation into the allegations of sexual abuse, he was contacted by the Lucas County Prosecutor's Office and informed that appellant had voluntarily taken and passed a polygraph test. As a result of the polygraph results, Colwell suspended his investigation, only to reopen the investigation 19 months later when he learned that appellant had started to communicate with M.D. again.

{¶ 22} During the reopened investigation, Colwell obtained possession of M.D.'s mobile phone, along with printouts of the messages contained therein. Colwell delivered M.D.'s phone for analysis of its contents to Sergeant Josh Seney of the Sylvania Police Department. Seney's subsequent analysis of the phone revealed the existence of Facebook messages that were sent from appellant's Facebook account, along with text messages and photos that were sent from a device utilizing appellant's mobile phone number. The messages retrieved from M.D.'s phone include incriminating statements pertaining to instances of prior sexual activity that occurred when M.D. was 10 years old. Additionally, three photos of appellant, two photos of a penis, and one photo of a vagina, all sent from appellant's mobile number, were retrieved from M.D.'s phone.

{¶ 23} In order to verify that the phone number from which the messages and photos were sent belonged to appellant, Colwell instructed T.P. to pose as M.D. and send

9.

a message to the number, asking appellant to bring food to M.D.'s school. As previously noted, appellant subsequently arrived at the school to deliver food to M.D., prompting Colwell's interview of appellant at the police station. At the conclusion of the interview, appellant provided Colwell with his contact information, including a mobile phone number that matched the number associated with the messages and photos discovered on M.D.'s mobile phone.

{¶ 24} On the third day of trial, the state's prosecutor disclosed that she had discussed Mercer's testimony with Schlievert. Specifically, the prosecutor informed the court: "So while speaking to Dr. Schlievert the State commented on the SANE exam testimony because it was her first time ever testifying. The State had articulated regarding how well the State thought she did, and that she even explained things like the hymen very well."

{¶ 25} Following the state's disclosure, appellant moved the trial court for a dismissal of all charges with prejudice, arguing that the prosecutor's discussion with Schlievert constituted prosecutorial misconduct in light of the agreed-upon separation of witnesses that was in place during the trial. Alternatively, appellant moved for a mistrial. In the event that his motion for a dismissal or mistrial was denied, appellant requested that Schlievert not be permitted to testify during the state's case-in-chief. Upon consideration, the trial court denied appellant's requests, finding that the prosecutor's conversation with Schlievert did not prevent appellant from having a fair trial and that

10.

any issues arising from the conversation could be addressed by appellant on cross-examination.

{¶ 26} The trial continued and Schlievert was permitted to testify. After Schlievert was finished testifying, the state called M.D. At the outset, M.D. indicated that she was born in November 2000, and was in the tenth grade at the time of trial.

{¶ 27} Throughout her testimony, M.D. detailed four instances in which she was raped by appellant. Consistent with prior statements she made to investigators, M.D. testified that appellant first began raping her when she was ten years old. M.D. explained that the rapes were a form of punishment. She testified that appellant would force her to choose to either be beaten all over her body with a belt or to have sex with him when she "didn't do something right," and she stated that appellant raped her "very often."

{¶ 28} Regarding the first rape, M.D. testified:

A. It was at night, and he had called me in the room, and he asked me if I knew what sex was. And I said no.

And then he was like okay. And then I was sitting on the edge of the bed, and he told me if I liked anyone at school, and I said no. And then he told me to think of someone like a celebrity or someone that I liked and pretend like it was one of them. And then he started to like touch me, and then it got to the point where he put his penis inside of me.

Q. Okay. When you say he put his penis inside of you where did he put it?

A. My vagina.

{¶ 29} Later in her testimony, M.D. detailed a second rape that occurred while she lived in Maumee, Ohio. The day before the incident, appellant and T.P. were involved in an argument over M.D.'s hygiene. The next day, appellant pulled M.D. to the side, threatened to stab her with a kitchen knife, raped her, and told her not to speak to her mother about what had happened between him and her.

{¶ 30} M.D. testified that the third rape occurred after M.D. moved to Sylvania, Ohio, three months prior to her thirteenth birthday. Describing the third rape, M.D. stated that appellant pushed her against the wall and told her to stop trying to push him away, at which point he raped her. Afterwards, M.D. cleaned up and appellant dropped her off at school.

{¶ 31} M.D. went on to describe the fourth and most recent rape. She testified that appellant directed her to put on a dress, and then proceeded to "put his penis inside [her] vagina."

{¶ 32} After questioning M.D. about the foregoing rapes, the state moved on to a discussion about a Facebook friendship M.D. had with an individual named Aladona Jones. M.D. explained that Aladona first contacted her and told her that she too had been raped by her stepfather. M.D. responded to Aladona's message, and a conversation

ensued during which M.D. told Aladona about the rapes involving appellant. Aladona suggested that M.D. resume contact with appellant.

{¶ 33} M.D. heeded Aladona's advice and a group chat involving M.D., Aladona, and appellant began. Subsequently, Aladona informed M.D. that she had contracted the HIV virus, and that there was a chance she might die. According to M.D., Aladona made M.D. promise to continue to talk to appellant if she died. At some point, a picture of a woman in the hospital was sent to M.D. from appellant's Facebook account. M.D. believed the account to be appellant's, because the profile picture was a photo of appellant, and the discussions she and appellant had over Facebook pertained to prior sexual acts and other information that only appellant would have known about. Ultimately, appellant sent M.D. a photo of himself holding money, and stating that he was about to pay for Aladona's funeral and cremation. M.D. testified that appellant also sent her photos of his penis.

{¶ 34} Following M.D.'s testimony, the state called T.P., who stated that she confiscated M.D.'s mobile phone after noticing suspicious activity. T.P. instructed M.D. to unlock the phone, at which point T.P. learned that appellant was communicating with M.D. and sending her pictures of his penis, which she found on the phone. T.P. also noticed the group chat M.D. had been having with appellant and Aladona. Upon further investigation, T.P. noticed that Aladona, who was supposedly two years older than M.D. and went to the same high school in Sylvania, suspiciously only shared one mutual Facebook friend with M.D., which was appellant. Further, T.P. noticed that Aladona and

13.

M.D. shared the same birthday. T.P. testified that Aladona seemed particularly interested in M.D. Ultimately, T.P. suspected that Aladona was not in fact a real person. Relatedly, Colwell was unable to find anyone by the name of Aladona Jones despite consulting several databases, including a database that includes death records for all individuals who are deceased.

{¶ 35} At the close of the state's case-in-chief, appellant moved for an acquittal under Crim.R. 29(A), arguing that the state failed to introduce sufficient evidence as to when exactly the alleged rapes took place, and further failed to establish that he was the individual who sent the electronic communications to M.D. Upon consideration, the trial court denied appellant's motion, and the matter proceeded to appellant's case-in-chief.

{¶ 36} Appellant's sole witness was Donald Smith, who testified that he is a pastor of the church appellant attended, Sylvania Community Church of the Christian Missionary Alliance. Smith first met appellant at a ministry breakfast meeting in June 2014, after which point they became good friends. Smith testified that appellant was a "minister of the word" at the church, and was "dutiful in terms of making sure that the church was kept clean and very diplomatic in that regard."

{¶ 37} After Smith's testimony concluded, appellant took the stand. Regarding discipline, appellant testified that he would lecture M.D. when she needed to be disciplined, and that he employed the same forms of corporal punishment with M.D. as he did with the other children. Appellant denied having ever raped M.D. as a form of punishment. He further stated that he never had any sexual contact with M.D.

14.

{¶ 38} When asked about his communications with M.D., appellant acknowledged that the phone number associated with the Facebook and text messaging pulled from M.D.'s phone was his phone number. Appellant further acknowledged that the photos found on M.D.'s phone were photos of his penis, but he insisted that he had no knowledge as to how they were sent to M.D. Appellant stated that his phone was not password protected, and could be used by anyone with access to it. While appellant admitted to having communicated with M.D. on Facebook, he insisted that none of the sexually explicit communications attributed to him by the state were actually sent by him.

{¶ 39} Continuing on in his testimony, appellant explained that he was contacted by T.P. on the day he was found attempting to deliver food to M.D. at her school. According to appellant, T.P. called him and asked him to bring food to M.D.'s school. Appellant stated that he received a text message from M.D. after he had already agreed to deliver food for T.P.

{¶ 40} Following his case-in-chief, appellant renewed his Crim.R. 29 motion, which was again denied by the trial court. The parties then presented their closing arguments, and the jury retired for deliberations. Thereafter, the jury returned with guilty verdicts on all counts contained in the indictment.

{¶ 41} At sentencing, the trial court imposed a sentence of 10 months in prison for importuning, 10 years for rape in violation of R.C. 2907.02(A)(2) and (B), and 10 years to life on each of the remaining three rape counts. The court imposed the rape sentences

15.

consecutive to one another, but concurrent to the importuning sentence, for a total prison term of 40 years to life.

## B. Assignments of Error

{¶ 42} Appellant has filed a timely notice of appeal, assigning the following errors for our review:

I. The trial court erred to the prejudice of Appellant in denying his motion to suppress in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution.

II. The trial court erred in denying Appellant's motion for a new trial based on prosecutorial misconduct.

III. The trial court erred in denying Appellant's Rule 29 Motion for Acquittal at the completion of the state's case in chief.

IV. Appellant's conviction was against the manifest weight of the evidence introduced by the state at trial.

## II. Analysis

### A. Motion to Suppress

{¶ 43} In his first assignment of error, appellant argues that the trial court erred when it denied his motion to suppress. As he did in the trial court below, appellant urges that the statements he made to Colwell at the March 15, 2016 interview should have been suppressed because they were either (a) uttered while he was subject to custodial

16.

interrogation without having been informed of his *Miranda* rights, or (b) solicited after appellant was informed of his *Miranda* rights and had invoked his right to counsel.

{¶ 44} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When the trial court considers a motion to suppress, it acts as the factfinder and is in the best position to resolve factual questions and to evaluate the credibility of witnesses. *Id.* We accept the trial court's findings of fact if they are supported by competent, credible evidence, but we must independently determine whether the facts satisfy the applicable legal standard without deferring to the trial court's legal conclusions. *Id.*

{¶ 45} "It is well-settled that when police take a suspect into custody, they are required to give *Miranda* warnings before subjecting the suspect to interrogation." *State v. Edwards*, 2018-Ohio-1739, 110 N.E.3d 1042, ¶ 8 (6th Dist.), citing *State v. Gumm*, 73 Ohio St.3d 413, 429, 653 N.E.2d 253 (1995). When police elicit statements while conducting a custodial interrogation without first informing the defendant of his *Miranda* rights, the statements must be suppressed and therefore cannot be introduced at trial as evidence of the defendant's guilt. *Berkemer v. McCarty*, 468 U.S. 420, 428, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

{¶ 46} "Where a custodial interrogation exists, the State bears the burden of establishing compliance with *Miranda* and a waiver of the defendant's *Miranda* rights. But the threshold burden of demonstrating the existence of a custodial interrogation rests

17.

with the defendant." (Citation omitted.) *State v. Muncy*, 2d Dist. Montgomery No. 21563, 2007-Ohio-1675, fn. 1.

{¶ 47} In determining whether a person is in custody, we consider whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. We consider all of the circumstances surrounding the interrogation in order to determine whether the defendant would have felt free to leave. *Howes v. Fields*, 565 U.S. 499, 509, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012). Relevant factors in this analysis include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. *Id.*

{¶ 48} Here, appellant argues that he was in custody from the moment he arrived at the police station and was placed in an interview room with an automatically locking door. Appellant asserts that the locked door "completely restricted" his freedom, especially because he was a suspect and was interviewed in an "extremely coercive environment."

{¶ 49} Upon review of the recorded interview that is part of the record, we find that appellant was not in custody during the entirety of the interview. Although the interview took place at the police station, which would weigh in appellant's favor, it is noteworthy that appellant appeared at the police station of his own volition. The interview was relatively short, lasting approximately 14 minutes. Throughout the interview, Colwell informed appellant that he was not under arrest and was free to leave

18.

at any time. While the state concedes that the door to the interview room automatically locked, there is no evidence that appellant was aware of that fact, and appellant was not handcuffed or physically restrained in any manner. Additionally, Colwell did not hesitate to permit appellant to leave the interview room as soon as he expressed a desire to terminate the interview.

{¶ 50} Taken together, we find that the foregoing facts would lead a reasonable person in appellant's position to feel free to leave upon request. As such, we conclude that appellant's statements were not elicited in violation of his *Miranda* rights, and are thus not subject to suppression.

{¶ 51} Moreover, we reject appellant's contention that the trial court committed reversible error in failing to suppress his post-*Miranda* statements elicited after he indicated that he "probably" needed an attorney. In *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the United States Supreme Court held that the invocation of a defendant's right to counsel must be clear and unambiguous such that a reasonable police officer would understand the statement as a request for an attorney. "If the statement fails to meet the requisite level of clarity, [*Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981),] does not require that the officers stop questioning the suspect." *Id.*, citing *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

{¶ 52} In this case, the state contends that appellant failed to clearly and unambiguously invoke his right to counsel when he indicated to Colwell that he probably

needed an attorney. As such, the state asserts that Colwell's continued questioning was permissible, and his post-*Miranda* statements were not subject to suppression. We need not reach the issue of whether appellant's statement amounted to an invocation of his right to counsel, because we find that the trial court's denial of appellant's motion to suppress, even if erroneous, did not prejudice appellant and was therefore harmless.

**{¶ 53}** In *State v. Durham*, 2016-Ohio-691, 60 N.E.3d 552, ¶ 172 (8th Dist.), the Eighth District articulated the harmless error doctrine in connection with an alleged *Miranda* violation:

> "An error in the admission of evidence is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction. *State v. Lytle*, 48 Ohio St. 2d 391, 358 N.E.2d 623 (1976), at paragraph three of the syllabus. 'Where constitutional error in the admission of evidence is extant, such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt.' *State v. Williams* (1983), 6 Ohio St. 3d 281, 452 N.E.2d 1323, paragraph six of the syllabus." *Id.*, quoting *State v. Jeffries*, 8th Dist. Cuyahoga No. 76905, 2000 Ohio App. LEXIS 3834, *9-10 (Aug. 24, 2000).

**{¶ 54}** As articulated below in our analysis of appellant's third and fourth assignments of error, the state introduced overwhelming evidence establishing appellant's guilt in this case. As such, we find that there is no reasonable possibility that the

information provided by appellant following his statement that he probably needed an attorney contributed to his conviction.

{¶ 55} In this case, Colwell posed two questions to appellant after appellant allegedly invoked his right to counsel. First, Colwell asked appellant where he worked. Appellant's response to this question had no bearing on his guilt in this case and was therefore not incriminating. After appellant indicated his desire to end the interview, Colwell asked his second question in which he requested appellant's contact information. The phone number provided by appellant in response to Colwell's inquiry matched the number associated with the messages that were sent to M.D., which contained incriminating statements that were sexual in nature. While perhaps incriminating, appellant's contact information was acknowledged throughout these proceedings, and appellant confirmed that the phone number associated with the messages that were sent to M.D. was his own during his testimony at trial.

{¶ 56} Because the statements made by appellant following his alleged invocation of his right to counsel were inconsequential to his conviction in this case, and in light of the overwhelming proof of appellant's guilt established by the remaining evidence that was introduced by the state, we find that any error in the trial court's denial of appellant's motion to suppress his post-*Miranda* statements was harmless. Having already concluded that appellant was not subject to custodial interrogation prior to being informed of his *Miranda* rights, we find no reversible error in the trial court's denial of appellant's motion to suppress.

21.

{¶ 57} Accordingly, appellant's first assignment of error is not well-taken.

## B. Prosecutorial Misconduct

{¶ 58} In his second assignment of error, appellant contends that the trial court erred in denying his motion for a mistrial, where the state allegedly committed prosecutorial misconduct by discussing the SANE nurse's testimony with Schlievert prior to Schlievert's testimony, in violation of the court's order for a separation of witnesses under Evid.R. 615.

{¶ 59} A motion for a mistrial is addressed to the sound discretion of the trial court. *State v. Glover*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). When the motion for a mistrial alleges prosecutorial misconduct, "a reviewing court must undertake a due process analysis to determine whether the conduct of the prosecutor deprived the defendant of his or her due process right to a fair trial." *State v. Saunders*, 98 Ohio App.3d 355, 358, 648 N.E.2d 587 (6th Dist.1994), citing *State v. Johnston*, 39 Ohio St.3d 48, 60, 529 N.E.2d 898 (1988). Therefore, we will not reverse a trial court's denial of a motion for a mistrial premised upon prosecutorial misconduct without a showing that the alleged misconduct deprived the defendant of a fair trial.

{¶ 60} In analyzing whether an appellant was deprived of a fair trial, we must determine whether, absent the alleged prosecutorial misconduct, the jury would have found the appellant guilty beyond a reasonable doubt. *State v. Maurer*, 15 Ohio St.3d 239, 267, 473 N.E.2d 768 (1984). In performing this analysis, we must consider the

22.

prosecutor's conduct in the context of the entire trial. *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

{¶ 61} Concerning the separation of witnesses at trial, Evid.R. 615(A) provides:

Except as provided in division (B) of this rule, at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. An order directing the "exclusion" or "separation" of witnesses or the like, in general terms without specification of other or additional limitations, is effective only to require the exclusion of witnesses from the hearing during the testimony of other witnesses.

{¶ 62} The separation of witnesses under Evid.R. 615 is designed to ensure that a witness's testimony is based upon his or her personal knowledge rather than being influenced by what he or she hears from another witness's testimony. *State v. Waddy*, 10th Dist. Franklin Nos. 87AP-1159 and 87AP-1160, 1989 Ohio App. LEXIS 4137, *64 (Nov. 2, 1989). "The spirit of the separation order is violated if counsel or a spectator briefs a witness upon other witnesses' testimony." *Id.*, citing *State v. Snowden*, 7 Ohio App.3d 358, 455 N.E.2d 1058 (10th Dist.1982).

{¶ 63} During the trial in this case, the state acknowledged having informed Schlievert that the SANE nurse did a good job testifying, particularly with respect to her explanation of the hymen. While this inadvisable discussion arguably violated the separation of witnesses order, there is no indication that the information the state shared

23.

with Schlievert prior to his testimony had any impact on the testimony he provided thereafter. As noted by the state in its brief, Schlievert's testimony at trial was consistent with his expert report that was authored on July 31, 2014, several years prior to the trial. Further, appellant had an opportunity to explore the impact of Schlievert's discussion with the prosecutor during his cross-examination of Schlievert, but failed to do so. Notably, Schlievert was asked on redirect examination whether the information he learned as a result of his discussion with the state impacted his testimony in any manner, and he responded in the negative.

{¶ 64} In light of the foregoing, we conclude that appellant has failed to demonstrate how the state's discussion with Schlievert prevented him from receiving a fair trial. Absent such a showing, we find that the trial court properly denied appellant's motion for a mistrial.

{¶ 65} Accordingly, appellant's second assignment of error is not well-taken.

### C. Crim.R. 29 Motion and Manifest Weight

{¶ 66} In his third assignment of error, appellant argues that the trial court erred in denying his motion for acquittal under Crim.R. 29(A). Relatedly, appellant argues in his fourth assignment of error that his conviction is against the manifest weight of the evidence. For ease of discussion, we will address appellant's third and fourth assignments of error simultaneously.

{¶ 67} We review a trial court's ruling on a Crim.R. 29(A) motion under the same standard used to determine whether the evidence was sufficient to sustain a conviction.

24.

*State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39-40. To determine whether there exists sufficient evidence to sustain a conviction, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, we do not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 68} When considering whether a defendant's conviction is against the manifest weight of the evidence, we sit as a "thirteenth juror." *Id.* at 387. That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 69} In the present case, appellant was convicted of one count of importuning in violation of R.C. 2907.07(D)(1), which provides:

(D) No person shall solicit another by means of a telecommunications device, as defined in section 2913.01 of the Revised Code, to engage in sexual activity with the offender when the offender is eighteen years of age or older and either of the following applies:

(1) The other person is thirteen years of age or older but less than sixteen years of age, the offender knows that the other person is thirteen years of age or older but less than sixteen years of age or is reckless in that regard, and the offender is four or more years older than the other person.

{¶ 70} Additionally, appellant was convicted of one count of rape in violation of R.C. 2907.02(A)(2), and three counts of rape in violation of R.C. 2907.02(A)(1)(b). R.C. 2907.02(A) provides, in relevant part:

(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

* * *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

26.

* * *

(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

{¶ 71} Under R.C. 2907.01(A), "sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another." Under the statute, any penetration, however slight, is sufficient to constitute vaginal or anal intercourse.

{¶ 72} In support of his sufficiency and manifest weight arguments, appellant contends that the state failed to introduce evidence that he was the individual who sent M.D. the sexually explicit text messages that were found on her mobile phone. As to the rape counts, appellant asserts that the state produced no evidence of physical or medical injuries to M.D. that would be consistent with rape, and also argues that the state failed to establish when exactly each rape occurred. Having carefully examined the trial record in its entirety, we find that appellant's sufficiency and manifest weight arguments are without merit.

{¶ 73} Regarding the importuning charge, the state introduced several text messages and Facebook messages that were sent to M.D. from appellant's mobile phone and Facebook account when M.D. was 15 years old and appellant was over twice her age.

27.

Having lived with M.D. for several years, it is clear that appellant knew M.D. was older than 13 years of age and less than 16 years of age. In many of these messages, appellant employed graphic sexual language in an effort to solicit M.D. to engage in sexual activity with him. For example, in a Facebook message sent from appellant's Facebook account to M.D.'s Facebook account, appellant stated:

I have to say this I have always been attracted to tall big breast sexy thick nice booty [women] I want you [so] bad right now I'm really trying to make myself go down trying to keep from [masturbating] at the thought of you. Maybe we should not ever meet cause I want you to take advantage of me any and every way you want I know this is fucked up I'm in no shape to see you cause I'll do what you want me to do you may have me eating [your] booty like groceries and my hooked ass would do it I got to find a way to fix me.

In another Facebook message, appellant informed M.D.: "If you [want] to get in the same bed as me and want me to just hold you that's fine [too]. Just understand I'm going to get really hard and you will feel it on your back or butt if I'm holding you."

{¶ 74} Appellant argues that there is no evidence to establish that he was the individual who actually sent the foregoing messages to M.D. However, the record belies appellant's argument. Indeed, appellant acknowledged at trial that the phone number associated with the messages was his phone number. Further, M.D. testified that the content contained in the messages included information that only she and appellant would

28.

have known, which led her to believe that appellant was the individual sending the messages. The messages also contained information about questions that were asked of appellant during the stipulated polygraph, which neither M.D. nor T.P. would have known about.

{¶ 75} Appellant speculated that T.P. perhaps set him up by sending these messages to M.D. However, it is unclear how T.P. would have had access to appellant's mobile phone since the two were no longer dating when these messages were sent. Further, appellant stated that his children have access to his phone, but he acknowledged that the children were not responsible for the messages in light of the fact that they were only three and six years old at the time.

{¶ 76} The detailed information set forth in the messages sent to M.D., which would have been known only to M.D. and appellant, paired with the fact that appellant's phone number was the source of the text messages, constitutes sufficient evidence that appellant was the individual who sent the messages to M.D. Moreover, we do not find appellant's speculative and unsupported assertion that T.P. sent the messages to be credible. Thus, we conclude that appellant's importuning conviction was not against the manifest weight of the evidence.

{¶ 77} Next, we turn to appellant's arguments concerning the rape convictions. First, appellant asserts that the state's evidence was insufficient to establish that a rape occurred because there was no evidence of physical or medical injuries to M.D. that would be consistent with rape. This argument fails for two reasons. First, the state is not

29.

required to support a charge of rape by introducing evidence of physical or medical injuries to the victim. Rather, the victim's testimony alone is sufficient to support a rape charge. *State v. Shoecraft*, 6th Dist. Lucas No. L-16-1228, 2017-Ohio-8771, ¶ 13, citing *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 53 ("Ohio courts have consistently held that a victim's testimony, if believed, is sufficient to support a rape conviction."). Second, appellant's invited inference that no physical injuries demonstrates that no rape occurred is contradicted by the testimony provided by Mercer and Schlievert, both of whom explained that physical injuries are rare in instances of delayed disclosure due to rapid healing following sexual abuse, particularly in victims of prolonged sexual abuse whose bodies adapt to such abuse over time.

{¶ 78} Appellant also argues that his convictions for rape were not supported by sufficient evidence because the state failed to establish the exact dates the rapes occurred. However, the state was not required to prove that appellant committed the rapes on exact dates. Indeed, "[w]here the exact date and time of an offense are not material elements of a crime nor essential to the validity of a conviction, the failure to prove such is of no consequence and it is sufficient to prove that the alleged offense occurred at or about the time charged." *State v. Fentress*, 8th Dist. Cuyahoga No. 85835, 2005-Ohio-5851, ¶ 21. "The date and time of a rape is not an essential element of the offense." *State v. Buchanan*, 2017-Ohio-1361, 88 N.E.3d 686, ¶ 22 (8th Dist.), citing *State v. Collinsworth*, 12th Dist. Brown No. CA2003-10-012, 2004-Ohio-5902.

30.

{¶ 79} This principle applies with particular force in cases involving sexual offenses committed against minors, because "many child victims are unable to remember exact dates and times, particularly where the crimes involved a repeated course of conduct over an extended period of time." *State v. Schee*, 6th Dist. Erie No. E-15-048, 2017-Ohio-212, ¶ 46, citing *State v. Mundy*, 99 Ohio App.3d 275, 296, 650 N.E.2d 502 (2d Dist.1994). "The problem is compounded where the accused and the victim are related or reside in the same household, situations which often facilitate an extended period of abuse." *State v. Robinette*, 5th Dist. Morrow No. CA-652, 1987 Ohio App. LEXIS 5996, *8 (Feb. 27, 1987). "[A]n allowance for reasonableness and inexactitude must be made for such cases considering the circumstances." *Id.*

{¶ 80} During her testimony, M.D. recounted at least four times she was raped by appellant. She testified that the first rape occurred when she was 10 years old. She went on to testify that a second rape occurred while she lived in Maumee, Ohio, at a time that she would have been less than 13 years old. The third rape M.D. detailed occurred shortly after M.D. moved to Sylvania, Ohio, which would have been three months prior to her thirteenth birthday. Finally, M.D. described the fourth and most recent rape, which is the only rape that M.D. detailed that took place after she turned 13 years old. In all of these instances, M.D. confirmed that appellant penetrated her vagina with his penis against her will. This testimony, taken alone, would have been sufficient to support appellant's rape convictions. *Shoecraft*, *supra*, at ¶ 13.

31.

{¶ 81} M.D.'s testimony was corroborated by the messages the state introduced at trial, which contained references to appellant's prior sexual conduct with M.D. During a conversation between appellant and M.D. on Facebook Messenger, appellant told M.D. that "the sex was good." When M.D. responded that she was only 10 years old at the time, appellant stated, "But I was trying to show you." In response to M.D. informing appellant that sex hurt, appellant stated: "Yeah because you really didn't want it. I know if you ever start to want it it would be good. I fucked up bad."

{¶ 82} Given the foregoing testimony and the messages sent from appellant to M.D. that were introduced by the state at trial, we find that appellant's rape convictions were supported by sufficient evidence. Moreover, given the compelling and largely uncontroverted evidence presented by the state, we do not find that this is an extraordinary case in which appellant's rape convictions should be reversed on manifest weight grounds.

{¶ 83} Accordingly, appellant's third and fourth assignments of error are not well-taken.

### III. Conclusion

{¶ 84} Having found each of appellant's assignments of error not well-taken, the judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                        _____
                                                 JUDGE

Thomas J. Osowik, J.            

Christine E. Mayle, P.J.          _____
CONCUR.                                              JUDGE

                                            _____
                                                 JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

33.