[Cite as *State v. Gebrosky*, 2024-Ohio-2659.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals Nos. WD-23-020 |
| | WD-23-021 |
| Appellee | Trial Court Nos. 2021CR0388 |
| | 2022CR0096 |
| v. | |
| John Eric Gebrosky | **DECISION AND JUDGMENT** |
| Appellant | Decided: July 12, 2024 |

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Chief Assistant Prosecuting Attorney, for appellee.

Autumn D. Adams, for appellant.

* * * * *

**ZMUDA, J.**

## I. Introduction

{¶ 1} This consolidated matter is before the court on appeal from the Wood

County Court of Common Pleas judgments of March 24, 2023, following two separate

trials, sentencing appellant, John Gebrosky, to an aggregate prison term of 21 years to

life. For the reasons that follow, we affirm.

## II. Facts and Procedural History

{¶ 2} In August 2021, in Wood County case No. 2021CR388, the state charged appellant with one count of rape in violation of R.C. 2907.02(A)(1)(b) and (B), a felony of the first degree, and one count of gross sexual imposition in violation of R.C. 2907.05(A)(4) and (C)(2), a felony of the third degree. In March 2022, in Wood County case No. 2022CR096, the state filed additional charges, charging appellant with one count of rape in violation of R.C. 2907.02(A)(2) and (B), a felony of the first degree, and one count of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A) and (B)(1), a felony of the fourth degree. Both cases involved delayed reporting by a child victim.

{¶ 3} In case No. 2021CR388, the state alleged appellant engaged in sexual conduct and had sexual contact, on or about December 25, 2016,[1] with his daughter, H.G., who was 11 years old at the time. In case No. 2022CR096, the state alleged appellant engaged in sexual conduct with A.J., who was 13 years old, and engaged in sexual conduct with a minor between the age of 13 and 16, and appellant was more than four years older than the victim at the time, with the conduct occurring on or about May 1 to June 30, 2012.[2]

---

[1] Initially, H.G. alleged the contact took place over the Christmas holiday in 2017, but she later clarified it happened in 2016 and the state amended the charges accordingly.

[2] After A.J. testified, the state amended the indictment to narrow the time frame from May 1 to September 1, 2012, as initially charged, to conform to the evidence pursuant to Crim.R. 7(D).

2.

**{¶ 4}** The state sought to join the two cases for trial. Appellant's trial counsel objected, and the trial court denied the request for joinder. The matter proceeded to separate trials.

### A. Case No. 2021CR388

**{¶ 5}** A jury trial in case No. 2021CR388 was held September 13-15, 2022. The state presented testimony of H.G., the victim; Anissa, appellant's former girlfriend and mother of his two younger children; Detective Israel Garrett, a Lucas County special victims unit detective who first investigated the offenses; Carrie Menchaca, a behavioral specialist employed by H.G.'s counseling agency; Samuel Young, appellant's fellow inmate at the jail while he awaited trial; and Detective Dustin Glass, the Wood County detective who received the case from Detective Garrett and later spoke with Samuel Young.

**{¶ 6}** At the time of H.G.'s testimony, she was 16 years old and a junior in high school. H.G. testified regarding events over Christmas, 2016, when she was 11. As background, H.G. indicated appellant and her mother separated when H.G. was very young. H.G.'s mother had custody and appellant had visitation. H.G. testified she met Anissa when she was about 5 years old, when appellant and Anissa began their relationship. H.G. viewed Anissa as a stepmother, and felt close to her two half-siblings, born to Anissa.

**{¶ 7}** H.G. recalled the events occurred during Christmas, 2016, because her maternal grandmother had just passed away and it was her little sister's first Christmas. Because it was appellant's visitation time, she spent the holiday with appellant. He,

3.

Anissa, and their two children were staying with Anissa's father in Perrysburg during the holiday. H.G. testified regarding the layout of the home, the two upstairs rooms where Anissa's father and his wife slept and where appellant, Anissa, and the younger children slept. H.G. indicated she either slept on a living room couch or on the floor in appellant's and Annisa's room with her two siblings.

{¶ 8} H.G. testified that, around 1:00 a.m. on December 24, she and appellant were downstairs watching a movie while everyone else slept upstairs. H.G. testified that appellant asked her to "move couches and come lay next to him" because he was cold. H.G. complied, and appellant positioned himself behind H.G., spooning, with a blanket between them. Appellant then moved the blanket "and he was breathing really heavy" in her ears. She testified appellant started running his hands up the front and sides of her legs, from ankle to her inner and outer thighs, causing H.G. to feel "weird" and stay "still." During this conduct, appellant told H.G. he loved her. He stopped after she got up and walked away. When H.G. went into the kitchen, appellant followed her and "cornered" her there, and told her "that what he was doing would put him in jail for a long time." H.G. testified that she began having a panic attack and appellant followed her into the living room with a glass of water "and kept saying he doesn't know what happened, told me to drink water." Eventually H.G. calmed down, but she did not tell Anissa or anyone else what happened. Nothing further occurred that night, and in the morning her mother picked her up and took her for breakfast.

{¶ 9} H.G. said nothing to her mother regarding the incident, and she felt too uneasy to eat breakfast. She told her mother she was not feeling well. When H.G.'s

4.

mother returned her to the house after breakfast, appellant was standing by the couches, "waiting for me to get there." H.G. testified appellant waiting for her was unusual, and appellant "started apologizing and saying that it wouldn't happen again," regarding the incident the night before. H.G. testified that something else happened the next night.

{¶ 10} According to H.G., appellant repeated the conduct of the night before as H.G. and appellant were sitting on the couches around 1:00 a.m. She testified:

> He had me lay down and he was laying next to me and was rubbing up my legs again, the same way he was doing the night before. He asked me to get up and take off my pants because they were bothering him. And I was – I didn't want to at first, but I didn't really, again, think much of it because I had a long T-shirt on that night too, so it covered me.

{¶ 11} H.G. indicated she went to the other couch and lay on her stomach, but appellant followed her and asked to give her a back massage. H.G. testified she was uncomfortable, but appellant had given her a back massage before, so she "didn't really put two and two together." She then described the back massage as:

> He didn't – he didn't sit down at first, he just put his hands on my back, and then he sat at the bottom of my legs, over me, with a blanket, and was rubbing my back.
> * * *
> He was rubbing his hands on my back, until he started rubbing his body against my back.
> * * *
> Like, he was laying on top of me and he was moving himself back and forth.

H.G. then felt appellant's hands "move over my underwear, and then I felt something very close to my vagina. What I presume was either his fingers or his penis." H.G. testified that she jumped up when she felt this, before his fingers or penis could enter her vagina.

{¶ 12} After this encounter, H.G. did not want to lay down again, so appellant asked her to play the "food game," a game H.G. and her younger siblings had watched on YouTube where one person is blindfolded and the other person gives them weird food combinations that the blindfolded person tries to identify. H.G. testified she had never played the game before but agreed to play with appellant. H.G. testified that appellant wore the blindfold first and H.G. combined ketchup with "something else out of the fridge and had him try it and he couldn't guess what it was."

{¶ 13} H.G. wore the blindfold next and sat on a chair near the dining room table. She described the game in testimony, as follows:

> Q: Okay. So you were blindfolded, and then, what happened next?
> A: I had my – I had my leg up on the chair in front of me and I was – I was blindfolded, and he pushed my leg off and put his leg up there. But I didn't know – like, I knew he pushed my leg off but I didn't know he put his leg up, because I couldn't see anything.
> Q: And when you say he put his leg up, where did he put it?
> A: On the chair in front me.
> Q: On the chair that you were sitting on, or on a different chair?
> A: The chair that was sitting next to me, it was a different chair.
> Q: Okay. So, go ahead, what else happened?
> A: He told me to open my mouth and he put something in it that, initially, tasted sweet, and he told me not to bite down.
> Q: What did you think about that instruction?
> A: I didn't think anything. I mean, we were playing the food game, I just figured that he wanted to make it harder or something, more difficult to play.
> Q: What happened next?
> A: He started moving my head back and forth.
> Q: How did he do that?
> A: He put his hand on the back of my head.
> Q: Okay. And what was happening with what was in your mouth?
> A: The sweetness flavor was going away.
> Q: What did you taste then?

A: Salt, salty.

Q: How long did he move your head back and forth?

A: Maybe less than a minute before I moved myself.

Q: What made you move yourself?

A: He told me not to bite down but I bit down a little bit and it made him jump, which made me move, and then I took the blindfold off and he ran into the kitchen, hunched over, holding either his stomach or whatever – or – with a party cup in his hand.

Q: Okay. What did you do, then, did you follow him into the kitchen?

A: Yes.

Q: Okay, what happened next?

A: I asked him what it was and he told me it was a pepper. And I said, peppers don't taste sweet. And he said he dipped it in syrup. Which, the party cup on the counter had syrup or honey in it.

{¶ 14} H.G. also testified that she noticed appellant's leg was up on the chair when she took her blindfold off. She also testified that, although appellant tried to convince her it was a pepper in her mouth, she knows it was appellant's penis based on appellant's later admission to her. H.G. described bringing the matter up in a conversation with appellant, sometime later, in which appellant admitted his conduct:

We went to the park, and it got brought up, and at first he told me that it was a toy, that it was a dildo, and then he told me that it wasn't, that it was him, and then he – then he tried to take it back and go back to saying it was a dildo.

H.G. then clarified that when appellant said it was him, "he called it his dick." She also testified that she brought it up on a later date when she was explaining to appellant why she did not want to sleep in the same room with him. After this, H.G. testified she pretended the incident never happened, and mainly stayed with his mother for appellant's visitation and did not like being alone with appellant.

{¶ 15} Around 2019, H.G. had an incident with her mother that resulted in a referral to children's services and a brief placement with appellant's mother. H.G. began seeing a therapist and admitted to cutting since the age of 11. Eventually, H.G. shared the incidents involving appellant with a close friend. In 2020, she disclosed the incidents to Carrie Menchaca, the behavioral specialist, believing the disclosure would remain private as part of therapy. As a mandatory reporter, Menchaca notified authorities, police investigated, and appellant was charged.

{¶ 16} On cross-examination, H.G. admitted she remained close with Anissa after Anissa and appellant ended their relationship, and H.G. spent time with Anissa and her younger half-siblings every weekend. H.G. also admitted that, during the conflict with her mother she asked to live with appellant, but she testified that she made the request because she "knew I would be with my grandmother." As to the incidents, H.G. admitted she never saw appellant's penis. H.G. also acknowledged that she initially reported the abuse by a "family member," without naming appellant. She did not identify appellant until police interviewed her.

{¶ 17} Anissa testified next. She confirmed the family stayed with her father during Christmas, 2016, and lived with her father from October 2016 until April, 2017. Anissa also testified regarding the layout of the home, describing the bedroom she shared with appellant and their two children, upstairs. Anissa testified that they never had a stable home, and would live with her mother, his mother, or her father when they did not have their own place. She testified that when they did get their own place, "it always fell through and we didn't stay very long," citing an inability to pay the bills, leading to

8.

evictions. Anissa testified she and H.G. have a good relationship and continue to spend time together since the break-up with appellant.

{¶ 18} On cross-examination, Anissa admitted she never had any concerns about appellant and H.G. and never noted any concerning behavior by appellant. Anissa acknowledged that H.G. could be "untruthful" when she was much younger, but as she got older "she learned to just tell the truth about things."

{¶ 19} Next, the state called Detective Israel Garrett. Detective Garrett conducted the initial interview with H.G. and then with appellant, and the jury viewed a redacted videorecording of appellant's interview.[3] Detective Garrett testified regarding his work with the special victim's unit, and described delayed disclosure, indicating delayed disclosure is not unusual for child victims. Garrett then outlined the process that brought H.G.'s allegations to police, indicating the police received a report from the Children Services Bureau in August of 2020. Soon after, Garrett received the assignment to investigate, and he interviewed H.G., who was then 14 years old. Garrett confirmed some of the details with Anissa regarding the place where the incidents occurred. He then interviewed appellant who denied the allegations but admitted that H.G. had viewed pornography and that he smoked marijuana around H.G. and let her try marijuana. Appellant also told Garrett that H.G. had contacted his mother, and H.G. told her grandmother that the matter had been "blown out of proportion."

---

[3] The state redacted portions of the recording that referenced appellant's prison terms and Detective Garrett's questions about conduct that occurred in Lucas County.

9.

{¶ 20} On cross-examination, Detective Garrett admitted he did not attempt to obtain photographs of H.G.'s Christmas in 2016, or talk to any other people in the house, such as Anissa's father and stepmother. He also did not interview appellant's mother. Garrett admitted he did not subpoena appellant's phone records to check the records against H.G.'s allegations. However, Garrett did indicate that appellant first claimed he knew nothing of the allegations, then said "it was just touching," and then referenced H.G.'s statement that "it was blown out of proportion," with Garrett's response, "Well, what's blown out of proportion, it was just touching?"

{¶ 21} Next, Carrie Menchaca testified. She indicated she is a behavioral specialist and not a therapist. Menchaca testified she focuses on problem areas, as identified by the therapist, such as "social skills and academic skills." Menchaca was unaware of H.G.'s problem with cutting until H.G.'s last session when H.G. brought it up, saying she did not do that anymore. H.G. then disclosed that a family member had abused her. Menchaca alerted her supervisor, then reported the incident to children's services. H.G. had no further contact with Menchaca after that session.

{¶ 22} Appellant's trial counsel did not cross-examine Menchaca.

{¶ 23} The state's next witness was Samuel Young, who met appellant in jail. Young testified that he was 19 and in jail for violating a protection order, serving a three-month sentence. He testified he spoke with appellant the first two months, with each sharing details of their cases. According to Young, appellant maintained his innocence, telling Young he did not do anything, or his family was setting him up. Young testified that he was helpful when appellant would describe anomalies in his case, such as

10.

problems with the dates/timeline, because Young felt their situations were somewhat similar and had empathy towards appellant. But later, Young testified, he believed appellant was using his advice to create a false alibi to claim he was not present on the dates H.G. claimed the incidents occurred. Young also began to feel uncomfortable around appellant after appellant described the food game and putting a hot dog in her mouth, and otherwise shared more details regarding the charges. Young testified appellant never admitted to the conduct, but appellant indicated he would use Young's "advice to help his case." This prompted Young to ask to speak to police or the prosecutor because he "didn't want people to think I was helping him[.]"

{¶ 24} On cross-examination, Young admitted appellant never confessed to him, and Young did not have access to the discovery in appellant's case, but only saw one paper, which "was the text message."

{¶ 25} The state's final witness was Detective Dustin Glass, the Perrysburg Township investigator who took the case from Detective Garrett. Glass testified he met with Detective Garrett, reviewed the case file and interviews, and eventually re-interviewed H.G. in July of 2021. He noted H.G.'s interviews were consistent despite the passage of time. His attempt to re-interview appellant was unsuccessful.

{¶ 26} Detective Glass then spoke with Samuel Young. Glass testified that there was never discussion with Young regarding consideration for information provided, with no talk of any deal or promises regarding Young's case. Glass indicated Young was concerned that appellant was going to say Young "was giving him information, possibly,

to do an alibi," and he wanted to make clear he was not working with appellant "to help him cover anything up."

{¶ 27} On cross-examination, Glass acknowledged he did not interview anyone else to corroborate H.G.'s story and did not interview Anissa or any other people in the house on the dates of the incidents. Glass also testified he did not use any specific method in interviewing children and did not "have any training in that stuff."

{¶ 28} The state moved to admit exhibits, including the redacted video recording of appellant's interview and H.G.'s therapy records. The trial court admitted the exhibits without objection. Out of the jury's presence, the defense moved for acquittal pursuant to Crim.R. 29, and the trial court denied the motion.

{¶ 29} The defense then called two witnesses: appellant's mother and appellant.

{¶ 30} Appellant's mother testified that she was once very close to H.G. She also indicated that H.G. would stay with her often. She was now aware of the allegations and recalled a Perrysburg Township detective leaving a message for appellant to call. On cross-examination, appellant's mother admitted she had no knowledge of any incidents during Christmas, 2016.

{¶ 31} Appellant then took the stand in his own defense. He testified regarding his relationship with H.G., and with Anissa. Appellant indicated H.G. did not accept Anissa at first, but the relationship grew into a good bond, which he supported, and Anissa and the three children continued to spend time together. Appellant testified he was surprised by H.G.'s allegations, because when he was released from prison just before the allegations, H.G. was upset that she could not come see him yet; appellant did not have

12.

housing ready so he could not have visitation. After the allegations, appellant testified he received "odd" Facebook messages "just saying sorry, dad, I miss you," and he was not sure if it was H.G. sending the messages.

{¶ 32} Appellant claimed he spent the nights of the incidents wrapping presents and had pictures on his phone to corroborate this, but after he was taken into custody in a separate case and incarcerated, he no longer had access to his phone. He also disputed H.G.'s and Anissa's claim that the family spent Christmas, 2016, with Anissa's father. As to the conduct, appellant admitted to massaging H.G., but denied it was sexual. He admitted playing the food game with H.G. and his son in 2017, but otherwise denied any incident happened as H.G. claimed.

{¶ 33} Appellant also disputed much of Samuel Young's testimony. He testified that Samuel Young tried to talk to him, but he did not like Young and did not want to associate with him. Finally, appellant claimed he attempted to return Detective Glass's phone call, but he had been given the wrong number.

{¶ 34} On cross-examination, the prosecutor focused on appellant's testimony that tended to support H.G.'s accusations, such as the massages or the food game. The prosecutor also challenged appellant's claims that he never spoke about his case with Samuel Young, or that the family did not stay with Anissa's father at the time of the incidents. When asked about each allegation made by H.G., appellant testified that each allegation was a lie.

{¶ 35} At the conclusion of testimony, the defense renewed the motion for acquittal pursuant to Crim.R. 29, and the trial court denied the motion.

13.

{¶ 36} The jury deliberated and found appellant guilty of both charges in case No. 2021CR388. The trial court continued sentencing in the case until conclusion of the second trial.

**B. Case No. 2022CR096**

{¶ 37} A two-day jury trial began in case No. 2022CR-096 on February 27, 2023. The state presented testimony of Anissa; A.J., the victim; A.J.'s mother, and Detective Israel Garrett.

{¶ 38} Anissa testified that she first met A.J. when A.J. dated her little brother, while both were in junior high school. Anissa testified that A.J. was 13 and Anissa's brother was 14. After A.J. and Anissa's brother broke up, appellant continued contact with A.J., giving her rides, buying her things, and hanging out with A.J. while Anissa was at work. This contact bothered Anissa and caused arguments and tension in the relationship between Anissa and appellant. Anissa asked appellant to stop but appellant refused. Anissa confided in her mother, who knew A.J.'s father. Eventually, Anissa and her mother went to A.J.'s house to talk to A.J. and A.J.'s mother. Anissa testified that after this visit, and A.J.'s confirmation that appellant took her dress shopping, Anissa remained uneasy. Anissa admitted she did not like appellant but was testifying to help A.J. receive justice, and not to get back at appellant. Anissa testified that she and A.J. are not friends.

{¶ 39} On cross-examination, Anissa testified that her only contact with A.J. was through her brother, during the year A.J. and her brother dated. During this period, Anissa and appellant lived either with her mother or his mother, but because she was still in school, Anissa primarily stayed with her mother during the school year. During this time, 14.

she and appellant shared a vehicle and he used it after dropping her off at work. Anissa testified she confronted A.J. only once, and admitted she continued her relationship with appellant for several more years. Anissa denied her testimony was related to her custody dispute with appellant and denied she reached out to A.J. to encourage her to accuse appellant.

{¶ 40} Next, A.J. testified. She indicated she first met appellant in 2010, when she was 12, while she dated Anissa's brother. After a year of dating, the relationship ended in November of 2011. A month later, A.J. was at a Quinceañera and needed a ride home. Appellant was also there with Anissa and her mother, and Anissa asked appellant to give A.J. a ride home. Appellant gave A.J. a ride.

{¶ 41} A.J. testified that her home life was difficult based on her mother's drug addiction and her father's limited involvement in her life at the time. She stated:

> My mom was on drugs, she wasn't aware of the things that were going on in my life, where I felt that she didn't really make decisions on my behalf. Sometimes I would ask her if I could go do something and the next day she didn't remember where I was. I – I played lots of sports when I was that age just so I didn't have to be home and I could be involved in other things. Life at home was really hard, there was, oftentimes, we didn't have heat or power or food in the house. Yeah, it was just a really hard time in my life.

{¶ 42} A.J. testified that, throughout 2012, she accepted rides, food, and gifts from appellant. Appellant bought A.J. clothes and food and "one time he bought [A.J.] a ring." When A.J.'s mother noticed the ring, A.J. lied to her mother and claimed she found the ring at Maumee Bay State Park. A.J. indicated that appellant "told everyone that he was my big brother and that he was there to look out for me and protect me." Instead of protection, A.J. testified that "there were sexual activities involved" with appellant's help.

15.

A.J. testified regarding two such incidents, with the trial court noting a continuing objection to questions regarding the first incident, for which appellant was not on trial.

{¶ 43} First, A.J. testified that one time when appellant picked her up to drive around, he took her to a secluded, industrial area she did not recognize, and asked her "to touch his penis and kiss him." When A.J. refused, appellant "told me that he wasn't going to take me home until I did that." A.J. testified that she did not know where they were or how she would get home, because "we had been driving for a while before we got to that location so I thought I was pretty far from home." A.J. testified she felt "scared, trapped, yeah, like I had no control over my life." A.J. also testified that appellant told her that nobody would believe her if she tried to tell.

{¶ 44} Second, A.J. testified about the day appellant took her to Cedar Point during the spring of her eighth-grade year. She testified that she told her mom she was going to school, but instead, appellant picked her up and drove her to Cedar Point. She and appellant rode the rides and had lunch, with appellant paying for everything. On the way home, appellant told A.J. they needed to make a stop. A.J. testified that appellant stopped at a motel on Woodville Road, and it was next to a bowling alley she used to go to when she was a kid. A.J. identified the bowling alley by name and police showed A.J. photographs of the bowling alley and motel as part of the investigation. A.J. confirmed the photos depicted the same motel.

{¶ 45} Once in the motel room, A.J. testified that appellant held her down on the bed, pushed a bullet-shaped spermicide inside her vagina, and then put his penis inside her vagina. A.J. testified that she "kept telling him that I wanted him to stop and I didn't

16.

want to do this, and he told me it would be very quick and then he would take me home afterwards." A.J. did not tell anyone what happened because she "didn't think anyone would believe me. I didn't feel there was a safe person to talk to about it." A.J. indicated police eventually contacted her and she spoke to Detective Garrett.

{¶ 46} A.J. acknowledged Anissa came to her house to confront her around this time, questioning whether A.J. and appellant were "in a relationship." A.J. told them appellant would not leave her alone and she wanted it to stop. A.J. did not disclose the abuse, however, because she felt attacked and not safe. A.J. testified she broke off contact with appellant by avoiding him. She testified, "I stopped accepting his phone calls and text messages, I hid away at friends' houses."

{¶ 47} On cross-examination, A.J. admitted to having many boyfriends, indicating one boy she dated on and off from fifth grade until her sophomore year of high school, with her relationship with Anissa's brother during a break in the relationship, when she was in seventh grade. She dated another boy for three years beginning her senior year of high school. She then met her current boyfriend. A.J. also acknowledged Anissa messaged her on Facebook in 2021, but denied the two were friends, other than Facebook friends, probably initiated when she dated Anissa's brother in 2010. A.J. testified she did not plan with Anissa to report appellant to benefit Anissa in a custody dispute.

{¶ 48} Next, A.J.'s mother testified about events in 2012. She indicated she was now sober since 2017, but in 2012 she was struggling with an opioid addiction. Appellant would come to her house and give A.J. rides, which A.J.'s mother accepted because she did not have transportation at the time. A.J.'s mother testified that she asked A.J. about a

17.

ring, and A.J. told her she found in the bathrooms at a park. Eventually, A.J.'s mother learned the ring was a gift from appellant. A.J.'s mother also recalled the visit by Anissa and her mother, confronting A.J. about "some sort of relationship" with appellant. On cross-examination, she denied having a friendship with Anissa. A.J.'s mother acknowledged that appellant gave A.J. a tattoo in her home in 2012, while she was present.

{¶ 49} Finally, Detective Israel Garrett testified. He described his training and work for the special victims unit and testified regarding the investigation that led to Wood County. Garrett testified he became involved with the case after a police report filed in Toledo. After interviewing A.J., he determined the crimes occurred in a motel in Wood County. Detective Garrett identified photographs of the hotel and bowling alley and testified that A.J. did not know the name of the motel, but she did recall the name of the bowling alley, and he used that information to locate the motel. Detective Garrett testified he also interviewed Anissa, A.J.'s mother, and A.J.'s father, and information from all his interviews demonstrated consistencies. Garrett also addressed the delayed disclosure, testifying it is not unusual for a child victim to delay reporting abuse.

{¶ 50} On cross-examination, Detective Garrett admitted his contact with the motel was limited to asking the hourly room rate over the phone. He did not attempt to check the motel records for the period covering the incident or confirm appellant checked in. Detective Garrett testified he would not expect to obtain evidence from a ten-year-old crime scene.

18.

{¶ 51} After Detective Garrett's testimony, out of the presence of the jury, the trial court admitted the state's photographs of the motel and bowling alley as exhibits, and the state rested. The defense moved for acquittal pursuant to Crim.R. 29, which the trial court denied. Appellant chose not to testify, and the defense renewed the Crim.R. 29 motion, which the trial court denied. The jury returned, and the state and defense formally rested their respective cases before the jury. The trial recessed for the lunch break, with the jury charge expected after the break.

{¶ 52} After trial resumed, out of the presence of the jury, appellant asked to reopen his case so that he might testify. The state did not oppose reopening, and the trial court recessed trial so the parties could research whether appellant's guilty verdict in case No. 21CR388 could be addressed under Evid. R. 609. After the parties agreed the matter was proper impeachment evidence, appellant reiterated his wish to testify against the advice of his attorney. The trial court engaged in a colloquy with appellant regarding his rights and granted appellant's request to reopen the case.

{¶ 53} Appellant took the stand in his own defense and immediately addressed his prior, criminal record. He admitted he was found guilty of rape in case No. 21CR388, along with a conviction for violation of a protection order in 2019, with Anissa the complainant. Appellant testified regarding his relationship with Anissa, and indicated he met A.J. through Anissa. Appellant claimed he gave A.J. rides when Anissa was unavailable, and he did not consider A.J. a friend. He also testified that he only hung out with A.J. when Anissa and her brother were also present. Appellant maintained that A.J. hung around because she was Anissa's friend, and Anissa and A.J. would go shopping

19.

together. Appellant testified he only went to Cedar Point with Anissa, and never took A.J. to Cedar Point.

{¶ 54} Appellant testified that he and Anissa had a visitation dispute, beginning when he filed for visitation rights in 2019. Appellant claimed Anissa withheld his children from him and the "allegations started happening… because she changed the order while I was in jail, and when I came home she – for better lack of a term, these allegations started and she stopped allowing me to see the kids immediately." Appellant denied any improper conduct or contact with A.J. Appellant also testified that he had personal knowledge of a continuing friendship between Anissa and A.J., stating they continued to hang out, "went to, like dinners or movies" until the present, and spent Christmas together in 2019.

{¶ 55} On cross-examination, appellant maintained his innocence in case No. 21CR388, and testified he was appealing and did not rape H.G. He also testified that Anissa and A.J. were both lying about a continued friendship, and Anissa asked A.J. to make the allegations about him to keep him from his kids, despite the fact A.J. came forward two years after H.G. made her disclosure. Appellant also acknowledged that one of the reasons his relationship with Anissa ended was the fact he slept with Anissa's sister but claimed "we both had our infidelities."

{¶ 56} At the end of appellant's testimony and closing arguments, the trial court instructed the jury, with specific instruction regarding "other acts" as follows:

> The State must prove beyond a reasonable doubt that all, or at least part, of
> the offenses were committed in Wood County, Ohio. The evidence about
> the commission of acts other than the offenses with which the Defendant is

20.

charged in this trial cannot be considered for any other purpose than the purpose of background information. It was not received and you may not consider it to prove the character of the Defendant in order to show that he acted in conformity or in accordance with that character. It does not follow from the Defendant's past acts that he committed the particular crimes charged in this case. The State has the burden of proving each element of the particular crimes currently at trial beyond a reasonable doubt. The State cannot satisfy its burden merely by implying that the Defendant committed these crimes, because his other acts suggest a propensity to commit those crimes.

After deliberating, the jury found appellant guilty of both charges.

{¶ 57} On March 24, 2023, the trial court held separate sentencing hearings in case No. 2021CR388 and case No. 2022CR096.

{¶ 58} In case No. 21CR388, the trial court noted the jury found appellant guilty of rape in violation of R.C. 2907.02(A)(1)(b) and (B), a felony of the first degree, and guilty of gross sexual imposition in violation of R.C. 2907.05(A)(4) and (C)(2), a felony of the third degree. The trial court determined the two offenses were not allied offenses and not subject to merger, and imposed a mandatory prison term of 10 years to life for the offense of rape, and a definite prison term of 3 years for the offense of gross sexual imposition, ordered the sentences to be served consecutively, and classified appellant as a Tier III sex offender.

{¶ 59} In case No. 2022CR096, the trial court noted the jury found appellant guilty of rape in violation of R.C. 2907.02(A)(2) and (B), a felony of the first degree, and guilty of unlawful sexual conduct with a minor in violation of R.C. 2907.04(A) and (B)(1), a felony of the fourth degree. The trial court determined the two offenses merged, and the state elected to proceed to sentencing on the rape count. The trial court imposed a

21.

mandatory prison term of 8 years on the rape offense and classified appellant as a Tier III sex offender. [4] The trial court ordered the sentence in case No. 2022CR096 to run consecutively to the sentence in case No. 2021CR388.

{¶ 60} In both cases, the trial court noted the aggregate prison term imposed was 21 years to life, based on "8 years in case 2022CR096 and 13 years to life in case 2021CR0388."

{¶ 61} Appellant filed a timely appeal from both judgments, and we consolidated the cases for this appeal.

### III. Assignment of Error

{¶ 62} Appellant raises the following assignments of error in the consolidated appeal:

I.    The manifest weight of the evidence did not prove Gebrosky put his penis into H.G.'s mouth.

II.   The manifest weight of the evidence failed to establish that Gebrosky touched H.G. for the purpose of sexual arousal or gratification.

III.  Other alleged acts of sexual contact between A.J. and Gebrosky should have been excluded as more prejudicial than probative.

### IV. Analysis

{¶ 63} Appellant challenges the weight of the evidence to support his convictions in case No. 2021CR388, arguing H.G. lacked credibility for purposes of his rape

---

[4] The trial court did not impose a sentence pursuant to R.C. 2967.271 in case No. 2022CR096. We do not address the issue as no party raised it as error.

22.

conviction and that the state failed to demonstrate sexual motivation for purposes of his gross sexual imposition conviction. Appellant challenges the admission of other acts evidence as unduly prejudicial in case No. 2022CR096. We address the assignments of error according to each case.

### A. The manifest weight of the evidence supported conviction in case No. 2021CR388.

{¶ 64} Appellant's first and second assignments of error challenge the weight of the evidence in support of his convictions for rape and gross sexual imposition in case No. 21CR388. Appellant specifically challenges H.G.'s credibility on the rape conviction based on her initial claim the assault occurred in 2017 when she was 12, and her subsequent claim that she remembered the assault occurred in 2016, which appellant argues was done to ensure Wood County retained jurisdiction over the case and renders her testimony without credibility. As to the gross sexual imposition conviction, appellant argues there was no proof he touched H.G. for sexual gratification "because he breathed heavily while touching her," lacking evidence appellant does not normally breathe heavily as behavior "out of the norm."

{¶ 65} In challenging the manifest weight of the evidence, appellant either challenges H.G.'s credibility or argues insufficient evidence of conduct meant for sexual gratification. As explained in *State v. Thompkins,* 78 Ohio St.3d 380 (1997), sufficiency of the evidence and manifest weight of the evidence are different concepts, both qualitatively and quantitatively. *Thompkins* at 386. Sufficiency is a standard "applied to determine whether the case may go to the jury or whether the evidence is legally

23.

sufficient to support the jury verdict as a matter of law." *Id.,* quoting Black's Law Dictionary (6th Ed.1990). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386, citing *Tibbs v. Florida,* 457 U.S. 31, 45 (1982) (additional citation omitted.).

{¶ 66} "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. … Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) *Id.* at 387, citing Black's Law Dictionary. In considering the evidence based on a manifest weight challenge, an appellate court sits as a "thirteenth juror," and must review the entire record, weight the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether the jury clearly lost its way in resolving any conflicts in the evidence, creating such a miscarriage of justice that reversal and a new trial is necessary. (Citation omitted) *Thompkins* at 387. "Under the manifest weight of the evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive—the state's or the defendant's?" *State v. Herrera*, 2022-Ohio-4769, ¶ 37 (6th Dist.), citing *State v. Wilson,* 2007-Ohio-2202, ¶ 25. However, "[a] conviction should be reversed on manifest weight grounds only in the most "'exceptional case in which the evidence weighs heavily against conviction.'" *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

24.

**{¶ 67}** Appellant was charged in case No. 2021CR388 with rape in violation of R.C. 2907.02(A)(1)(b), which provides:

> No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
> …
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

Sexual conduct is defined at R.C. 2907.01(A) as including "fellatio … between persons regardless of sex." Black's Law Dictionary defines "fellatio" as "a sexual act in which the mouth or lips come into contact with the penis." Black's Law Dictionary (6th Ed.1990).

**{¶ 68}** In this case, H.G. provided detailed testimony of the rape, testifying regarding appellant's conduct during the "food game" and appellant's subsequent admissions to H.G. regarding the incident, disclosing the object placed in H.G.'s mouth was "his dick." H.G. also identified the timeframe as the Christmas holiday the family spent at Anissa's father's house, which she mistakenly placed in 2017 at the time of indictment, later corrected to 2016 in her testimony at trial.

**{¶ 69}** Appellant now argues that H.G.'s error in the date demonstrates she lacked credibility, relative to her entire testimony of the rape. However, H.G. was recalling events from her childhood, and "a certain degree of inexactitude in averments is not necessarily fatal to a prosecution in cases dealing with sex offenses against victims of tender years." *State v. Lawrinson,* 49 Ohio St.3d 238, 239 (1990). Furthermore, the exact date is not an element of the offense of rape. *State v. Gomez,* 2019-Ohio-576, ¶ 78 (6th Dist.), citing *State v. Buchanan,* 2017-Ohio-1361, ¶ 22 (8th Dist.), citing *State v.*

25.

*Collinsworth,* 2004-Ohio-5902 (12th Dist.). Finally, H.G.'s confusion of the year was offset by her recall of significant events that placed the incident on a timeline: her maternal grandmother had just died, and it was her sister's first Christmas. Details of the time frame, moreover, were corroborated by Anissa, who testified the family spent the holiday at her father's house.

{¶ 70} Appellant testified and disputed H.G.'s testimony at trial, and now argues the jury lost its way in believing H.G.'s testimony over his own, based on details H.G. did not relate, such as seeing his penis or his pants down, as well as her mistake regarding the year. We must examine the entire record, however, and give deference to the jury's credibility determinations "given that it is the fact-finder who has the benefit of seeing the witnesses testimony, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation and candor." *State v. Hendricks,* 2020-Ohio-5218, ¶ 39 (6th Dist.), citing *State v. Fell,* 2012-Ohio-616, ¶ 14 (6th Dist.). Considering this record, we do not find that the jury lost its way in returning a guilty verdict as to the rape charge.

{¶ 71} We also find no merit to appellant's argument, relative to his conviction for gross sexual imposition, claiming a lack of evidence demonstrating sexual arousal or sexual gratification.

{¶ 72} Pursuant to R.C. 2907.05(A)(4):

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>     …

26.

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

Sexual contact "means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, … for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 73} At trial, appellant testified that H.G. lied in her own testimony regarding the incident, admitting only to giving H.G. back rubs on occasion. He did not raise the issue of a lack of sexual intent. On appeal, appellant does not challenge most of H.G.'s testimony, including testimony that appellant lay on top of H.G. after having her remove her pants, appellant rubbed his body against hers while purporting to give her a shoulder massage, appellant touched her inner and outer thighs, and appellant moved her underwear aside, touching her vaginal area with either a finger or his penis. Instead, appellant maintains the state failed to demonstrate sexual arousal or gratification, because the state did not demonstrate that his "breathing heavily" was "a reflection of sexual gratification," and not his normal state.

{¶ 74} While appellant does not appear to dispute H.G.'s testimony that she was touched on one or more erogenous zones, as described under R.C. 2907.01(B), there must also be some evidence that the touching was done for sexual gratification. *In re Anderson,* 116 Ohio App.3d 441, 443 (12th Dist.1996). The additional element of purpose makes gross sexual imposition a specific intent offense. *State v. Schmidt,* 2022-Ohio-4138, ¶ 34 (12th Dist.), citing *State v. Mundy,* 99 Ohio App.3d 275, 292, (2d Dist.1994). Proof of this intent, however, need not be established through direct evidence of arousal or sexual

27.

gratification. (Citation omitted) *State v. Solomon,* 2021-Ohio-940, ¶ 48 (8th Dist.). "Whether the touching was undertaken for the purpose of sexual arousal or gratification is a question of fact to be inferred from the type, nature, and circumstances surrounding the contact." *In re Anderson* at 443-444, citing *Mundy* at 289.

{¶ 75} Contrary to appellant's argument, the jury heard testimony depicting more than heavy breathing. In addition to heavy breathing, appellant asked H.G. to remove her pants, and he positioned himself on top of H.G. and rubbed his body against hers as he touched her inner and outer thighs. Appellant then moved her underwear aside and touched her vagina. Courts have found lesser circumstances supported a finding of sexual motivation. In *State v. Dooley*, 2005-Ohio-628 (8th Dist.), touching the victim's belly button satisfied the element of sexual intent, based on the totality of the circumstances, where the defendant showed an attraction to the victim and attempted to kiss and wanted to 'play' with the victim's belly button. *Dooley* at ¶ 32. The nature of the touching, moreover, permits an inference of sexual motivation. In *State v. Vanpernis*, 2022-Ohio-4563 (4th Dist.), the defendant touched the victim's vagina while "cuddling" on the couch, with sexual motivation reasonably inferred because "there is no innocent explanation for this behavior." *Vanpernis* at ¶ 14.

{¶ 76} The jury considered testimony of appellant's heavy breathing as part of the totality of the evidence, and based on the record, sexual motivation was a reasonable inference. Appellant cites to no authority demonstrating that the state was also required to present evidence that proved his heavy breathing was not his natural state. Furthermore, because the jury could observe appellant during the trial, both at the defense table and

28.

when appellant took the stand to testify, the jury would have had a frame of reference to determine whether heavy breathing was "out of the norm" for appellant and could have weighed that with all the other evidence for purposes of determining a sexual motivation.

{¶ 77} Accordingly, upon due consideration of the record, we do not find the jury lost its way and created a manifest miscarriage of justice, requiring reversal. Appellant's convictions for rape and gross sexual imposition were supported by the manifest weight of the evidence. We find appellant's first and second assignments of error not well-taken.

**B. Admission of other acts evidence did not result in reversable error in case No. 2022CR096.**

{¶ 78} In his third assignment of error, appellant challenges evidence relative to his second trial in case No. 2022CR096. Appellant argues the trial court improperly admitted other acts evidence to prove his propensity to commit the offenses because A.J. testified regarding an unindicted, prior incident with appellant. He argues that this unconnected incident, sometime before the trip to Cedar Point, provided no probative value, and was introduced only "to evoke the jury's horror and desire to punish."

{¶ 79} Appellant challenges only the testimony concerning the prior incident, which the state argued was admissible as background evidence of a related act or evidence of appellant's plan, to establish appellant's access to A.J. and to explain how A.J. skipped school to go to Cedar Point with appellant. The state argued that testimony of a prior incident of sexual contact was material to a disputed issue and provided explanation for A.J.'s delayed reporting of the charged offenses. This was consistent with the state's notice of intent to use evidence, in which the state indicated an intent to use

29.

this evidence "for the limited purpose of creating a 'setting,' and [to] help the jury understand and consider the nature of the relationship of the Defendant and minor victim." The state argued the evidence was admissible as "past sexual activity with the victim" under R.C. 2907.02(D) or as evidence of "scheme, plan, or system" in committing the act, pursuant to R.C. 2945.59.

{¶ 80} Throughout the proceedings, appellant denied having contact with A.J. after A.J. stopped dating Anissa's brother and maintained that A.J. accused him of rape at the behest of Anissa, to help Anissa's custody case. Appellant objected to the evidence of the prior incident, preserving the issue for appeal. The trial court overruled that objection, permitting A.J.'s testimony on the matter. "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law." (Citation omitted) *State v. Hartman,* 2020-Ohio-4440, ¶ 22. However, a trial court's determination after weighing the probative value of admissible other-acts evidence against the prejudicial effect is reviewed for an abuse of discretion. *Id.* at ¶ 30.

{¶ 81} As an initial matter, we note that the state argued R.C. 2907.02(D), the rape shield law, as a basis to admit evidence of prior sexual activity between A.J. and appellant. "Ohio's rape-shield law protects both the accuser and the defendant from the admission of evidence of prior sexual activity." *State v. Jeffries,* 2020-Ohio-1539, ¶ 14. Pursuant to R.C. 2907.02(D):

> Evidence of specific instances of the victim's sexual activity, … shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or sexually transmitted disease or infection, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and

30.

that its inflammatory or prejudicial nature does not outweigh its probative value.

Thus, "R.C. 2907.02(D) provides that evidence of defendant's past sexual activity with the victim or evidence of 'other acts' pursuant to R.C. 2945.59 is admissible only to the extent that the court finds that the evidence is material to a fact at issue in the case, and finds that the inflammatory or prejudicial nature of such evidence does not outweigh its probative value." *State v. Acre,* 6 Ohio St.3d 140, 143 (1983). In his appeal, appellant limits argument to admissibility and the undue prejudice from this testimony, outweighing any probative value. We limit our analysis to this argument.

{¶ 82} "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character." *State v. Williams,* 2012-Ohio-5695, ¶ 15, citing *State v. Curry,* 43 Ohio St.2d 66, 68 (1975); *State v. Jamison,* 49 Ohio St.3d 182, 185, (1990). However, there are exceptions to this rule, recognized at common law and codified in R.C. 2945.59. R.C. 2945.59 provides:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

Additionally, Evid.R. 404(B) provides:

> (1) *Prohibited Uses*. Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

31.

(2) *Permitted Uses; Notice*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. …

{¶ 83} To satisfy the relevance test, the evidence must be relevant to "a non-character-based issue that is material to the case." *State v. Smith*, 2020-Ohio-4441, ¶ 38. Specifically, the relevancy determination does not concern whether the evidence is relevant to the ultimate determination regarding guilt, but rather, "whether the evidence is relevant *to the particular purpose* for which it is offered." (Emphasis sic.) *Hartman*, 2020-Ohio-4440, at ¶ 26, citing *State v. Curry,* 43 Ohio St.2d 66, 73 (1975). The "particular purpose," moreover, "must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 27, citing *Huddleston v. United States,* 485 U.S. 681 (1988).

{¶ 84} The state argued it offered the evidence to demonstrate background or demonstrate a scheme, plan, or system, and that the evidence was admissible pursuant to R.C. 2907.02(D) and R.C. 2945.59. Whether evidence is offered to demonstrate a "scheme, plan, or system" is relevant in two scenarios: "those in which the other acts form part of the immediate background of the alleged act that forms the foundation of the crime charged in the indictment and those involving the identity of the perpetrator." *Williams* at ¶ 18, citing *Curry* at 72.

{¶ 85} In considering admissibility of such evidence, courts must conduct the following three-step analysis:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show

32.

activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R 403.

*Williams*, 2012-Ohio-5695, ¶ 20.

{¶ 86} Appellant's challenge concerns the non-character purpose, argued by the state and accepted by the trial court in permitting the testimony of the prior incident. The state argued the testimony was properly admissible to demonstrate background and to demonstrate a scheme, plan, or purpose. We first consider whether the prior incident was introduced as background evidence.

{¶ 87} Evidence of background refers to "the immediate background of the alleged act." *See State v. Williams,* 2012-Ohio-5695, ¶ 18, citing *State v. Curry,* 43 Ohio St. 2d 66, 73 (1975). Background evidence is necessary evidence, as "it would be virtually impossible to prove that the accused committed the crime charged without also introducing evidence of the other acts." *Curry* at 73. The state advanced no argument to support the use of the prior incident as *necessary* background evidence, with argument limited to explanation of appellant's access to A.J. or explanation of A.J.'s delay in reporting the incident following the trip to Cedar Point.

{¶ 88} In this case, A.J. testified at length regarding her desperate conditions at home and appellant's provision of transportation, food, and clothing. She also testified regarding appellant's representation to others of a brotherly concern, contrasted with appellant's actions that belied any "brotherly" feelings, summarized by A.J. as the "sexual activities" in return for appellant's help. Appellant's trial counsel did not object to

33.

this testimony, and this testimony presented a history of appellant's interactions with A.J., explaining appellant's access to A.J. and demonstrating how A.J. could skip school to go to Cedar Point with appellant.

{¶ 89} The testimony of Anissa and A.J.'s mother mostly corroborated A.J.'s testimony of her history with appellant and provided evidence to explain A.J.'s delay in reporting appellant's offenses. A.J., Anissa, and A.J.'s mother each testified regarding Anissa's visit to A.J.'s house to confront A.J., an eighth grader, and question A.J. about a "relationship" with appellant. A.J. testified that this confrontation with Anissa made her feel unsafe. A.J. further testified that she had nobody to go to for help, and instead, stayed with friends and otherwise hid herself from appellant to sever all contact with him.

{¶ 90} Unlike the testimony of A.J. that detailed the history of appellant's involvement in and eventual extrication from her life, with details corroborated by Anissa and A.J.'s mother, the state failed to demonstrate that testimony of the prior, unindicted incident constituted background evidence for the indicted offenses. To constitute background evidence, the evidence must be "relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Williams* at ¶ 20, citing Evid.R. 401.

{¶ 91} For example, in *State v. Fips,* 2016-Ohio-5402, (8th Dist.), testimony regarding other, unindicted conduct, was deemed admissible as background evidence. In that case, evidence of prior sexual touching, reported by the minor victim, had resulted in her parents' installation of locks on the bedroom door to keep Fips, a family member, away from the victim. *Fips* at ¶ 36. The minor later moved to another bedroom, without

34.

the same lock, and Fips resumed his conduct, escalating to sexual conduct. *Id.* The minor victim accused Fips of rape, but subsequently recanted the accusation and asserted the sex was consensual and not by force. *Id.* at ¶ 25. The state sought to introduce other-acts evidence of the prior, sexual touching, including installation of locks, to demonstrate a lack of consent and demonstrate the offender's "scheme and progression – from consensual and experimental touching to forcible rape[.]" *Id.* at ¶ 34. The evidence was deemed relevant on the issue of "consent," a material issue in dispute at trial. *Id.* at ¶ 33.

{¶ 92} In appellant's case, the state made only conclusory argument of relevancy to connect the prior incident with the charged offenses, with little to demonstrate the appellant's previous conduct was "inextricably related" to the offenses on trial and necessary in explaining the sequence of events that led to these offenses. *See State v. Thompson,* 66 Ohio St.2d 496, 498 (1981), citing *State v. Wilkinson,* 64 Ohio St.2d 308 (1980). Specifically, the state advanced no argument that supported a need for details of the prior incident of sexual contact to explain why A.J. went to Cedar Point with appellant, or that these details were "necessary to give a complete picture of the alleged crime." *Thompson* at 498, citing *Wilkinson* at 317.

{¶ 93} Next, we must consider whether testimony of the prior incident was introduced to demonstrate appellant's scheme, plan, or purpose. Evidence in this category could be evidence of prior, similar conduct showing appellant's plan to target and groom A.J. to facilitate the offenses. *See, e.g., Williams,* 2012-Ohio-5695 at ¶ 21-22 (testimony of another victim demonstrated the offender's preparation and grooming of his victims). However, this "plan" evidence should demonstrate the accused "has committed similar

35.

crimes within a period of time reasonably near to the offense on trial, and that a similar

scheme, plan or system was utilized to commit both the offense at issue and the other

crimes." *Curry* at 73, citing *Whiteman v. State,* 119 Ohio St.285 (1928); *Barnett v. State,*

104 Ohio St.298 (1922); *see also State v. Frost,* 2007-Ohio-3469, ¶ 33 (defendant

committed similar crimes against the same victim near in time to the charged offenses).

{¶ 94} In *State v. Hartman,* 2020-Ohio-4440, the Ohio Supreme Court clarified

"common-plan" evidence, relating such evidence to background evidence. The Court

explained:

> Common-plan evidence generally concerns events that are "inextricably
> related" to the crime charged. …; *Curry*, [43 Ohio St.2d at 73]. The other
> acts form the "immediate background" of the present crime: they are
> typically either part of the "same transaction" as the crime for which the
> defendant is on trial or they are part of "a sequence of events" leading up to
> the commission of the crime in question. ... As one authority has explained,
> this type of other-acts evidence is admitted:
>
>> [t]o prove the existence of a larger, continuing plan, scheme, or
>> conspiracy, of which the present crime on trial is a part. This will be
>> relevant as showing motive, and hence the doing of the criminal act,
>> the identity of the actor, and his intention, where any of these is in
>> dispute.
>
> McCormick [*Evidence,* Section 190, 448-449]. Thus, plan evidence
> generally supports one of the following possible conclusions: "(1) the
> occurrence of the act in issue; (2) the identity of the person who committed
> the act; or (3) the existence of the required mental state in the actor."

*Hartman* at ¶ 41-42 (internal citations omitted.). In *Hartman,* the Court cautioned that

"plan evidence should show that the crime being charged and the other acts are part of the

same grand design by the defendant. Otherwise, proof that the accused has committed

36.

similar crimes is no different than proof that the accused has a propensity for committing that type of crime." *Hartman* at ¶ 46.

{¶ 95} In the present case, the record on appeal does not demonstrate similar offenses or clearly identify temporal proximity between the prior incident and the charged offenses. A.J.'s testimony concerned another incident in 2012, arguably close in time to the rape, as part of appellant's involvement with A.J. that year that included giving her rides, food, and gifts, with the attendant "sexual activities" demanded by appellant in exchange. There is little in the record, however, to demonstrate the prior assault was part of a larger scheme, of which the prior incident was only a part, or a preparatory act for the rape. *Hartman* at ¶ 42-43.

{¶ 96} Additionally, evidence of intent or plan was not material to an issue in dispute regarding the elements of the charged offenses. The state had introduced evidence that established appellant often drove A.J. around, but the issue was not "why" appellant was with A.J.; appellant denied any contact with A.J. or that the trip to Cedar Point ever occurred. *See, e.g., State v. Decker,* 88 Ohio App.3d 544, 548 (1st Dist.1993) (intent not material issue where defendant completely denied any involvement in the acts alleged). Therefore, based on the record, the state's "proper purpose" argument lacked factual support, and the trial court erred in admitting the testimony.

{¶ 97} Having found the testimony of the prior incident not properly admissible, we must next address whether the error requires reversal and a new trial. The state argues that, because the defense requested and was granted a limiting jury instruction regarding the other-acts testimony, appellant invited any error regarding the other-acts evidence,

37.

waiving all but plain error. However, because appellant *did* object to the admission of the evidence and does not challenge the limiting instruction as error, the doctrine of invited error is inapplicable on appeal. Invited error prevents a litigant from taking advantage of error "invited or induced." (Citation omitted) *State v. Grate,* 2020-Ohio-5584, ¶ 197. There is nothing in the record demonstrating appellant invited admission of the other-acts evidence, the issue on appeal.

{¶ 98} Rather than invited error, the matter concerns error in the admission of Evid.R. 404(B) evidence, necessitating harmless error review to determine whether the error affected substantial rights, mandating a new trial as remedy. *State v. Morris,* 2014-Ohio-5052, ¶ 26. In addressing harmless error, we apply the three-part analysis established in *Morris* and restated in *State v. Harris,* 2015-Ohio-166, ¶ 37*:*

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. [*Morris*] at ¶ 25 and 27. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. *Id.* at ¶ 28. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt. *Id.* at ¶ 29, 33.

*Harris* at ¶ 37

{¶ 99} In the instant case, we cannot find that appellant was prejudiced by the error, as the record demonstrates that testimony of the prior incident was limited and lacked specifics. Appellant acknowledged the vague and abbreviated nature of this testimony, arguing the state had plenty of other testimony to demonstrate the stated purpose for the other-acts evidence and introduced testimony of a prior sexual incident "to evoke the jury's horror and desire to punish."

38.

**{¶ 100}** We also find that the error was harmless beyond a reasonable doubt. In reviewing the record, A.J.'s testimony regarding the prior incident inferred the sexual contact occurred, without expressly testifying she submitted to appellant's demands. In contrast, A.J.'s testimony about appellant's other conduct demonstrated appellant did favors for A.J. in return for "sexual activities" and after the Cedar Point trip, appellant forcibly raped her. The trial court instructed the jury, moreover, to limit consideration of the prior incident, and we presume the jury followed the trial court's direction. *State v. Noling,* 2002-Ohio-7044, ¶ 39, citing *State v. Williams,* 73 Ohio St.3d 153 (1995).

**{¶ 101}** Finally, excluding the evidence of the prior incident, and weighing the remaining evidence proffered at trial, we find the state established appellant's guilt beyond a reasonable doubt. Both A.J. and appellant took the stand and testified, with appellant's version of events wholly inconsistent with the testimony of A.J. Much of A.J.'s testimony was also corroborated by Anissa and A.J.'s mother. In other words, the state's case was supported by consistent, testimonial evidence that negated appellant's claim that he never had any contact with A.J. leading up to and during the time of the charged offenses. The state's evidence, furthermore, established proof of all elements of the charged offenses. Considering this record, the evidence supported the verdict beyond a reasonable doubt.

**{¶ 102}** Therefore, based upon our review, any error in admitting the other-acts evidence was harmless beyond a reasonable doubt. Accordingly, we find appellant's third assignment of error not well-taken.

39.

## V. Conclusion

**{¶ 103}** Having found substantial justice has been done, we affirm the judgments of the Wood County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.                           _____
                                                 JUDGE
Myron C. Duhart, J.

Charles E. Sulek, P.J.                  _____
CONCUR.                                             JUDGE

                                               _____
                                                 JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.